**ROBERT'S WAIKIKI U-DRIVE, INC., a Hawaii Corporation; Robert's Kauai U-Drive, Inc., a Hawaii Corporation; Robert's Maui U-Drive, Inc., a Hawaii Corporation; and Robert's Hawaii U-Drive, Inc., a Hawaii Corporation, Plaintiffs, Counterclaim-Defendants,**

v.

**BUDGET RENT-A-CAR SYSTEMS, INC., a corporation, Defendant, Counterclaim-Plaintiff.**

Civ. No. 77-0009.

United States District Court, D. Hawaii.

June 9, 1980.

Martin Anderson, David J. Reber, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for plaintiffs, counterclaim-defendants.

Wallace S. Fujiyama, Fujiyama, Duffy & Fujiyama, Honolulu, Hawaii, Robert Salman, Phillip, Nizer, Benjamin, Krim & Ballon, New York City, for defendant, counterclaim-plaintiff.

## DECISION ON MOTIONS

SAMUEL P. KING, Chief Judge.

### I. BACKGROUND FACTS

Robert's Waikiki U-Drive, Inc., *et al.*, (Robert's) brought this action in 1977 against Budget Rent-A-Car Systems, Inc. (Budget) for damages resulting from certain fly-drive agreements Budget had entered into with Aloha Airlines in 1971 and Pan American World Airways in 1972, and from certain acquisitions made by Budget in 1969. The case arises under the federal antitrust laws and the antitrust and unfair competition laws of the State of Hawaii. The Court has independent jurisdiction over the state claims because of diversity of citizenship.

Plaintiffs (Robert's) were four car rental companies doing business on Oahu, Maui, Kauai and Hawaii. These companies were consolidated by merger on December 31, 1978. Robert's is a closely-held, family-owned and operated corporation, operating under the direction of the Robert Iwamoto, Sr. family.

Budget's Hawaii operations were opened in the early 1960's by Irwin Bickson through a licensing or franchise agreement between Budget Rent-A-Car Corporation of America and Mr. Bickson's partnership, doing business as Budget Rent-A-Car of Hawaii. In 1969, Leisure Corporation, a subsidiary of Transamerica Corporation, acquired the independently owned, exclusive Budget licensees on the islands of Oahu, Maui and Kauai. Budget of Kauai was partially owned by Robert Iwamoto, Jr., an officer and director of various Robert's companies, and when he sold out to Leisure, he was required to enter into a restrictive covenant that prevented him from actively participating in the car rental market in Hawaii for five years. In 1974, Leisure Corporation was merged into Transamerica. Defendant Budget now operates the Hawaii franchises and is a wholly owned subsidiary of Budget Rent-A-Car Corporation, which is also owned by Transamerica. Defendant is an Illinois corporation engaged in the car rental business in various states.

Though the acquisitions of the licensees are challenged by Robert's, the crux of the case is the fly-drive agreements. Beginning in the summer of 1971, Budget, in conjunction with Aloha Airlines, began offering fly-drive programs. The essence of these programs was that the consumer was offered a package, so that when he flew on Aloha he received a special rate on a Budget car. In the first program, an Aloha passenger who flew to Maui or Kauai could rent a Budget car for one day for $19.95. In the second program, an Aloha passenger who flew to the island of Hawaii could rent a Budget car for one day for $12.95. The third program, and the one that is at the heart of this lawsuit, was the $7.00 fly-drive package. In an agreement with Aloha, Budget promised to rent automatic compact cars to certain Aloha passengers for one day for $7.00. The regular Budget rate was $14.00.

This agreement was entered into between Budget and Aloha in September 1971, and provided that Aloha was to pay Budget $7.00 for each rental. The program remained in effect through September 1973. In October of that year a new fly-drive agreement was entered into, and by its terms the payments to Budget were not to be linked to the number of cars rented, but rather were to be linked to Budget's pro-rata share of the advertising costs of the programs.

Robert's contends that the Federal Aviation Act forbade an airline from reducing the airfare it was required to charge under its tariffs. Robert's claims that although the payments to Budget from Aloha were stated to be for advertising expenses, they were in fact illegal rebates that had the effect of reducing airfares. Robert's also claims that Budget and Aloha engaged in a fraudulent coverup to hide the true nature of the rebates from the C.A.B., from competitors and from the general public. Robert's alleges that during the course of the coverup Budget and Aloha falsified invoices, and Aloha and its employees submitted altered documents to and gave perjured testimony before the C.A.B.

In April 1972, Budget entered into a fly-drive agreement with Pan American. The agreement covered only the island of Oahu, and the fly-drives were available both to round-trip Pan American passengers and to passengers who switched from another carrier to Pan American for their return trip to the Mainland. The payments from Pan American to Budget were $5.00 per rental.

In June 1972, the C.A.B. began an investigation of the Budget-Pan American fly-drive program. Richard O'Melia, Director of the Bureau of Enforcement of the C.A.B., wrote to the President of Pan American stating that the C.A.B. had received a complaint contending that the fly-drive arrangement constituted "rebates in violation of Section 403(b) [49 U.S.C. § 1373(b)] of the Federal Aviation Act and an unfair practice or an unfair method of competition within the meaning of Section 411 [49 U.S.C. § 1381] of the Act." Robert's alleges that during the C.A.B. investigation a false copy of the Budget-Pan American agreement was submitted to the C.A.B. The submitted agreement spoke of Pan American reimbursing Budget for one-half of the total advertising expenditures, rather than Pan American paying Budget a flat, per-car figure. Robert's also claims that during a contemporaneous C.A.B. audit of Aloha, a similar false contract was submitted. The C.A.B. closed its informal investigation of the Budget-Pan American fly-drives without determining the legality of the arrangement. Robert's argues that this was due to the fraud perpetrated on the C.A.B.

The C.A.B. commenced a formal enforcement proceeding against Aloha in 1973. In his 1975 decision, the Administrative Law Judge determined that Aloha had violated 1) § 403(b) of the Federal Aviation Act by indirectly rebating to passengers the payments it had made to Budget; 2) § 404(b) of the Act, 49 U.S.C. § 1374(b), by making the lower airfare available only to those passengers who rented Budget cars and 3) § 411 of the Act by violating § 403(b), and "by interfering with the normal competitive processes through the use of the unlawful

rebating plan to increase its market share at the expense of a competitor." The Administrative Law Judge ordered Aloha to cease and desist from its violations of the Act. The decision of the Administrative Law Judge was affirmed by the C.A.B. in an "Opinion and Order" filed in October 1976.

Aloha petitioned the Court of Appeals for the District of Columbia Circuit for review of the C.A.B.'s order. That court affirmed the C.A.B. insofar as it had determined that the 1971 fly-drive plan allowed for illegal rebates in violation of the Act, but reversed the C.A.B.'s finding that the 1973 agreement violated the Act. The court did not find substantial evidence in the record to support the latter finding. *Aloha Airlines, Inc. v. C.A.B.*, 598 F.2d 250 (D.C. Cir. 1979).

In 1972, Aloha initiated an antitrust action against Hawaiian Airlines in this Court. Hawaiian counterclaimed, charging that the fly-drive agreements were illegal under the antitrust laws. During pretrial proceedings on the counterclaim, Hawaiian asserted that the fly-drives were illegal tying arrangements. This Court rejected that claim as a matter of law. *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 68 F.R.D. 351, 353 (D.Hawaii 1975). A jury decided against Hawaiian on the counterclaim, but this Court granted a new trial because of evidence that John Sakamoto of Aloha had given perjured testimony. The counterclaim was settled before a retrial.

## II. ROBERT'S § 1 CLAIM AGAINST BUDGET

### A. *The Fly-Drives as Illegal Tying Arrangements*

Robert's initial contention is that the $7.00 fly-drive agreements between Budget and Aloha, and between Budget and Pan American, were tying arrangements, illegal *per se* under § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Robert's moves for partial summary judgment and for an order in the form of a jury instruction to the effect that these fly-drives were "tying arrangements which are to be found illegal *per se* under Section 1 of the Sherman Act if Robert's demonstrates that there was sufficient economic power in the tying product and a not insubstantial amount of commerce was affected."

■ The Court rejects the contentions of Robert's that the fly-drives were illegal tying arrangements.[1] On the surface the plan looks relatively simple. Certain Aloha customers were told that they could rent a Budget car for one day for $7.00. It appears at first glance that if there were a tying arrangement, the tying product was the discounted car rental. That was the product that was intended to, and in fact did attract customers. Clearly customers were not accepting the "onerous" discounted car rental rate in order to take advantage of the normal Aloha airfare. Nevertheless, plaintiffs ask the Court to rearrange the transaction. They contend that since in reality Budget was receiving rebates from Aloha in the amount of the discount (or nearly in the amount of the discount), the products should be viewed as a $14.00 car rental and discounted airfare. Therefore, contends Robert's, the discounted airfare was the tying product, and the car rental was the tied product. The Court will *arguendo* view the arrangement in this way.

■ The classical definition of a tie-in is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In other words, there

---

1. As noted above, the Court rejected a similar contention in earlier litigation. In that case, Hawaiian maintained that the discounted car rental was the tying product and the airfare was the tied product. Here, plaintiffs urge the Court to view the airfare as the tying product and the car rental as the tied product. Of course, it is necessary for these plaintiffs to so urge, as only those sellers competing in the tied market have standing to challenge the arrangement.

must be coercion. A buyer must be told that he will not get the tying product unless he purchases the tied product. "Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." 356 U.S. at 6 n.4, 78 S.Ct. at 518.

No fly-drive customers, however, were actually coerced. Plaintiffs do not contest the fact that consumers could travel on Aloha and rent a Budget car, or travel on Aloha and not rent a Budget car. Yet, they still argue that there was the requisite coercion. They begin and end their argument with *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*).[2] In *Fortner II*, U.S. Steel had one division that sold prefabricated houses, and another that provided financing for prefabricated house purchasers. U.S. Steel agreed to lend Fortner $2,000,000 on very advantageous terms, in return for Fortner's agreement to purchase, for $689,000, the components for 210 homes. Fortner contended that the credit terms offered were 1) not available but for the component purchase and 2) "unique." They therefore contended that because of the size of the U.S. Steel credit department, and because of the uniqueness of the financing (it covered 100% of Fortner's acquisition and development costs), U.S. Steel possessed "appreciable economic power" in the tying market, the market for the type of financing offered. In *Fortner II* the Supreme Court was considering the question of whether absent significant economic power in the credit market, the *per se* uniqueness of the credit offered was enough to establish appreciable market power. The Court held it was not.

Quite clearly, if the evidence merely shows that credit terms are unique because the seller is willing to accept a lesser profit—or to incur greater risks—than its competitors, that kind of unique-

ness will not give rise to any inference of economic power in the credit market. Yet this is, in substance, all that the record in this case indicates.

*Fortner II*, 429 U.S. at 621–22, 97 S.Ct. at 868. What plaintiffs focus on, however, is the fact that the Court viewed discounted financing as a tying product (or a potentially tying product). Robert's maintains that here the discounted airfare must be viewed as a different product than the non-discounted airfare, and thus the separate availability for purchase of non-discounted airfare becomes irrelevant. If a customer wanted the "unique" discounted airfare, he had to also purchase the tied car rental. The Court believes that Robert's misreads the *Fortner* cases.

The only financing U.S. Steel offered was the discount financing, and only to buyers of prefabricated houses. It was not in the business of offering credit *per se*, and it did not offer "regular" financing as well as discount financing. In this case, Aloha offered both discounted[3] and non-discounted airfare, and the non-discounted airfare could be purchased with no car rental strings attached. This is the equivalent of the situation described in *Northern Pacific*. "Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." 356 U.S. at 6 n.4, 78 S.Ct. at 518. The *Fortner* cases are inapplicable because in them the discounted financing was the *only* financing that was offered. There *was* coercion in that if the buyer wanted *any* financing at all from U.S. Steel, it had to purchase the houses.

In *Fortner II* the Court recognized that the uniqueness of certain types of products gave rise to a presumption of economic power. The Court was speaking of patent monopolies, copyright monopolies and extensive land holdings. 429 U.S. at 619, 97

---

**2.** A prior Supreme Court decision in the same case is *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (*Fortner I*).

**3.** It must always be kept in mind that the idea of a discounted airfare is an invention of the plaintiffs. No consumers ever thought they were getting a $14.00 car rental and a discounted airfare.

S.Ct. at 867. Plaintiffs contend that since Aloha was offering its rebates illegally, and other carriers (Hawaiian) could not legally compete, the discounted airfares had the same type of uniqueness as patents and copyrights.

The Court rejects this contention. If a patent holder offered a patented product for $50 by itself, and for $43 if purchased with a $14 widget, that would not on the surface be an illegal tie-in. That is so even though no other manufacturer could offer the patented product for sale at any price. If the terms were such that the price for the patented product alone was so high that no one would buy it without the widget, a question of a tie-in might be raised, since the separate price could be viewed as a non-legitimate offering. However, in this case, the non-discounted rate for the airfare was market price, and even the $14 rate for the alleged tied car rental was not high. The offering of the non-discounted airfare was legitimate. Robert's preoccupation with Hawaiian's legal barriers to meeting Aloha's price does not focus on the coercion question. The *Fortner* cases teach that legal barriers to competitors may make a product unique, but nowhere do they hold that there is coercion if the tying product is sold at market by itself, and below market in conjunction with another product.

A case in point is *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089 (E.D.Pa.1976), *aff'd*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). The simplified facts of this case are that Lilly sold two drugs, Keflin and Keflex, and it essentially had monopoly power in the market for those drugs.[4] It also sold a third, similar drug—Kefzol. SmithKline tried to compete in the market with Ancef, a product identical to Kefzol. Lilly offered a pricing schedule to hospitals, and the practical effect of the schedule was that if the hospitals purchased a sufficient amount of Kefzol (enough to effectively exclude them from purchasing a significant amount

of Ancef), they received a discount of 3% on their purchases of all three drugs. They were free to purchase Ancef, but if they did so, they would not, as a practical matter, be able to receive the 3% discount. Their purchases of Keflin and Keflex were very large, and they usually bought Kefzol, even though Ancef was cheaper. SmithKline claimed that in reality Lilly was conditioning the purchase of 3% discounted Keflin and Keflex on the purchase of expensive Kefzol. That is the same contention Robert's is making in this case (except for the fact that here the tied product—the "$14.00" car rental—is not expensive). The district court held that the arrangement was not a tie-in. It stated that since the buyer was free to buy the non-discounted Keflin and Keflex, there was no coercion and no tie-in. It went on to state:

From an abstract perspective, if one disregards the economics of the market place, hospital pharmacists had the "freedom to choose" any of Lilly's products without having to buy a tied product; thus they were "free to take either product by itself." . . . The economics of the marketplace precluded that freedom of choice for most hospitals; such a freedom of choice, more prevalent in theory than in operational reality, is enough to circumvent the tie-in prohibitions of the relevant antitrust laws.

427 F.Supp. at 1114. This is precisely in point. Robert's attempts to distinguish the case by contending there was an "absence of any . . . uniqueness" in the tying products in *SmithKline*. This is an untenable position. Lilly had huge, monopoly-type dominance, in the market for Keflin and Keflex—two patented products—[5] and in terms of an antitrust analysis, that is close to the maximum uniqueness possible. Other cases that the Court has examined support its conclusion that Robert's has not shown the requisite coercion so as to make

---

4. The district court specifically found monopoly power in the cephalosporin market, with most of that power derived from the sale of Keflin and Keflex. 427 F.Supp. at 1129.

5. *See* note 4 *supra*.

out a prima facie case of a *per se* violation of the Sherman Act.[6]

Defendant also argues that because neither Aloha nor Pan American had any direct economic interest in the tied product market, there was no tie-in. Robert's avers that because 1) each fly-drive package sold by Budget increased airline revenues; 2) Budget sometimes paid commissions to Aloha and 3) Budget paid some incentive bonuses to Aloha and Pan American employees, there was the requisite economic interest in the tied product market.

■ The law is straight forward in this area. The tying seller must have an economic interest in the tied market, *see Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977), and classically this takes the form of his trying to introduce a product into the tied market. *See, e. g., Rodrigue v. Chrysler Motors Corp.*, 421 F.Supp. 903, 904 (E.D.La.1976).

> In order for one to establish an illegal tying agreement, it is necessary to show that the tying arrangement involves a seller who not only competes in the tying item's line of commerce, but also participates for profit in the area of competition to which the tied item belongs.

*See also Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 456 (5th Cir. 1979) ("There is no illegal tying arrangement where a 'tying' company has absolutely no interest in the sales of a third company whose products are favored by the tie-in"); *BBD Transportation Co., Inc. v. United States Steel Corp.*, 1976–2 Trade Cases (CCH) ¶ 61,079 at 69,874 (N.D.Cal. August 25, 1976).

■ Plaintiffs' allegation that "substantial revenue" flowed to the airlines does not meet the economic interest test. Any time two products are sold as a package, there is presumably some benefit to both parties. There was an economic interest in the transaction—more particularly the part of the transaction that involved the payment for airfare—but that is not an economic interest in the tied product market. Showing revenue from the transaction as a whole is not enough. Similarly, the fact that Budget provided sales incentives to Aloha and Pan American employees did not result in Aloha and Pan American having an economic interest in the tied market.

Plaintiffs' claim as to rebates paid to Aloha by Budget presents a slightly different problem. The original $7 fly-drive agreement contained a provision that for every package that Aloha sold, Budget would pay Aloha one dollar. In *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), the court stated that in order for there to be a tying arrangement, the tying company must have a financial interest in the sales of the tied product. 585 F.2d at 834–35. The court noted, however, that in that case there were allegations of rebates from the producer of the tied product to the seller of the tying product. The court stated:

> The jury could have found from the evidence we have discussed that Sealy [manufacturer of the tying product—a franchise] forced the use of the [tied product] and was paid handsomely by Universal [manufacturer of the tied product] simply for creating a captive market in which it could and did charge a premium price. Even if the [tied product] was a superior product, such an arrangement was unlawful.

585 F.2d at 835.

Although plaintiffs' claim seemingly comes within the rubric of *Ohio-Sealy*, the

---

**6.** In *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977), the court, following *Northern Pacific*, found that as long as the buyer is free to take either product by itself there is no tying arrangement. The court also indicated that evidence of coercion would be an appreciable number of buyers forced to accept the tied product instead of desirable substitutes. Plaintiffs have made no showing at all on this point. *See also Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 400 (4th Cir. 1974) ("Because the combination rate offer is voluntary, we agree with the district court that it is not illegal *per se* as a tying arrangement").

Court finds a basic difference between the two cases. In *Ohio-Sealy*, defendant got the rebates because of sales of the tied product. Here, Aloha got the one dollar because it, not Budget, sold the package. Aloha's economic stake was not in the tied market but rather in its own selling ability.

In the situation contemplated in *Ohio-Sealy*, the manufacturer of the tied product would kick back money to the manufacturer of the tying product for steering business its way. Buyers would be forced (presumably) to pay higher prices for the tied product if they wanted the tying product. The seller of the tying product would make money each time a tied product was sold. Here, in a complete reversal of the situation contemplated in *Ohio-Sealy*, the seller of the tying product, Aloha, was *paying* the seller of the tied product, Budget, so that Budget's product could get a free ride. That the payment from Aloha to Budget was one dollar less when Aloha sold the product does not change the functional analysis. There was no interest in the tied product market because no money actually flowed to Aloha every time there was a car rental. Budget simply got one dollar less when Aloha sold the package. The evils that were alluded to in *Ohio-Sealy* are not present in this case, and the language regarding viewing a package sale as a tying arrangement because of rebates is inapposite. Aloha did not have an economic interest in the tied product market sufficient to allow the $7.00 fly-drive to be viewed as an illegal tying arrangement.

The Court notes finally that it has difficulty accepting the picture painted by Robert's—a picture that portrays the discounted airfare rather than the discounted car rental as the tying product. The Court does not feel that it need reach the question of the accuracy of the portrait. Since the requisite coercion was not present, and since Aloha and Pan American had no economic interest in the tied product market, the fly-drives were not tying arrangements amounting to *per se* violations of § 1 of the Sherman Act.

B. *Standing*

■ Plaintiffs contend that even if the conduct of Budget does not rise to the level of a *per se* violation of the antitrust laws, it still violates § 1 of the Sherman Act on a rule of reason analysis. Section 1 condemns unreasonable restraints of trade, and aside from several set categories of *per se* violations such as price fixing, the reasonableness of a particular restraint is determined by examining all the facts and circumstances surrounding the restraint. Budget first argues that plaintiffs have no standing to raise their § 1, rule of reason claims, because even if there were a conspiracy, Robert's was not within the "target area" of that conspiracy.

Budget relies on the case of *Conference of Studio Unions v. Loew's Inc.*, 193 F.2d 51 (9th Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). The Court believes that a thorough analysis of the *Studio Unions* case is appropriate. In that case there were a group of major studios (Majors) who were accused by an association of labor unions (the Conference) of conspiring with another group of unions (IATSE) to violate the antitrust laws. The complaint charged that the Majors and IATSE conspired for the purpose of destroying the Conference and its member unions, and for the purpose of "eliminating as competitors the motion picture production companies herein described as the Independents." 193 F.2d at 52. The alleged conspiracy was multifaceted. It included an agreement by the Majors only to hire IATSE members in most circumstances, and an agreement by IATSE to supply all the labor needs of the Majors before supplying any of the labor needs of the Independents. The Majors also agreed amongst themselves to curtail production of motion pictures and to limit competition in the distribution of motion pictures. The Conference contended that it suffered antitrust injury because the conspiracy prevented its members from working for the Majors. The court rejected this contention, holding that the conspiracy was directed toward the Independents and therefore only they had standing. According to the court, the Conference did not

suffer any injury due to a lessening of competition among the commercial studios, the only real targets of the conspiracy. The court stated:

> A conspiracy may have many purposes and objects; the conspirators may perform an almost infinite variety of acts in furtherance of the conspiracy; but, in order to state a cause of action under the antitrust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured "by reason" of anything forbidden in the antitrust laws.

193 F.2d at 54–55.

Budget argues that "under the misguided theory of the fly/drives as an antitrust conspiracy, if these programs were 'directed' at someone, competing airlines would have been the alleged 'targets.' . . . Budget's position is that Robert's is not in any area of the economy which is directly, and not merely incidentally, affected by the claimed wrong so as to give rise to antitrust standing." Budget's Reply Memorandum in Support of its Motion for Summary Judgment at 19. Budget reads *Studio Unions* as viewing the conspiracy alleged there as one that was intended to destroy both the Independents and the Conference. Budget claims that *Studio Unions* holds that even though IATSE, one of the conspirators, clearly had as its object the elimination of the Conference, the Conference was denied standing. The Court does not read *Studio Unions* that way.

What hurt the Conference was the agreement by the Majors only to hire IATSE members. The *Studio Unions* court did not view this agreement on the part of the Majors as itself violative of the antitrust laws. The *Studio Unions* court viewed only the conduct and agreements directed at the Independents (IATSE agreeing not to furnish workers, and restraints in film distributions) as arguably violative of the antitrust laws. Since the Majors' agreement not to use Conference workers was not an antitrust violation, the Conference was injured only incidentally as the result of the illegal conspiracy. In this case, Robert's alleges that 1) Budget's intent was to increase its market share (even though Aloha, obviously, was interested only in the air transportation market) and 2) the agreement did in fact restrain competition in the rental car market. Robert's maintains that since *Budget's* target was the car rental market, car rental companies have standing. In light of the Court's interpretation of *Studio Unions*, the Court agrees. There can be two targets of an antitrust conspiracy, and *Studio Unions* is not to the contrary.[7]

█ The formulation of the "target area" test of standing has changed somewhat since *Studio Unions*, and even since *In Re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 128 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturers Association, Inc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973) ("To attain standing, a plaintiff must thus allege that the antitrust violation injured a commercial enterprise of the plaintiff in the area of the economy in which the elimination of compe-

---

7. This Court is not alone in reading *Studio Unions* differently than Budget. In *Blankenship v. Hearst Corp.*, 519 F.2d 418, 425 (9th Cir. 1975), the court gave its view of *Studio Unions*: "The court found the plaintiff labor unions and its members to have suffered nonrecoverable 'incidental' damages from an alleged conspiracy to drive certain movie production companies which employed none of the union members out of business." Under this view, not only was the conspiracy itself not directed at putting the Conference out of business, it was not even directed at anyone who employed

Conference members. The *Blankenship* quote, therefore, can be viewed as intimating that had the Conference alleged that illegal conduct had been directed toward putting them out of business, or even directed toward putting someone who employed them out of business, there might have been standing. In this case, Budget was not concerned about competition in the air transportation market. It is irrelevant that a greater effect might have been expected in the air transportation market, as long as it is alleged that some restraint was foreseeable in the car rental market as well.

tition occurred"). In *Solinger v. A&M Records, Inc.*, 586 F.2d 1304, 1311 (9th Cir. 1978), the court related the test for standing: "In order to have standing under section 4 when the plaintiff has alleged violations of sections 1 and 2, Solinger must show that the injury occurred within an area of the economy that foreseeably would have been affected by the antitrust violation alleged." The court noted specifically that foreseeability had not been used by the *Multidistrict Vehicle Air Pollution* court in formulating a standing test.[8] In this case, it is certainly possible that the fly-drives could have endangered competitive conditions in the car rental market. Budget was offering cars at $7 below the market rate, and might possibly have been expected to pick up enough business to put some of its marginal competitors out of business. The allegation is that Budget's competition had no legal way of meeting Budget's rate, and the focus is not on what actually happened, but on what foreseeably could have happened. The Court holds that the foreseeability test is the proper one for standing,[9]

and finds that some competitive breakdown in the car rental market was foreseeable. Therefore, the Court finds that Robert's has standing to raise its § 1, rule of reason claim.

## C. *Injury to Competition*

■ In order to establish a prima facie case of a § 1, rule of reason violation, plaintiffs must show an injury to competition. As the Ninth Circuit has recently stated:

> The elements of a cause of action for an unreasonable restraint of trade under the rule of reason analysis of Sherman One are: (1) An agreement among two or more persons or distinct business entities; (2) Which is intended to harm or unreasonably restrain competition; (3) And which actually causes injury to competition.

*Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir. 1979); *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 844 (9th Cir. 1980).[10]

---

**8.** 586 F.2d at 1311 n.6. The Court also noted that in a § 1 action "the scope of parties who can be directly injured by an action that 'the antitrust laws are designed to prevent' is much broader" than in a § 7 action. 586 F.2d at 1312 n.9.

**9.** *See, e. g., Blankenship v. Hearst Corp.*, 519 F.2d 418, 426 (9th Cir. 1975) ("In order to define the proper limits of the target 'area of the economy' one determines what area 'could reasonably be foreseen would be affected' by the alleged illegal activity"); *In re Western Liquid Asphalt Cases*, 487 F.2d 191, 199 (9th Cir. 1973), *cert. denied sub nom. Standard Oil Co. of California v. Alaska*, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974) ("[T]he area of the economy which appellees reasonably could have or did foresee would be endangered by the breakdown of competitive conditions"); *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 220 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964) ("[P]laintiff must show that, whether or not then known to the conspirators, plaintiff's affected operation was actually in the area which it could reasonably be foreseen would be affected by the conspiracy").

**10.** The Supreme Court has recently stated that a § 1 violation can be established by proof of *"either* an unlawful purpose or an anticompetitive effect. *United States v. United States Gypsum Co.*, 438 U.S. 422, 436, n.13, 98 S.Ct. 2864, 2873 n.13, 57 L.Ed.2d 854 (1978); see

*United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969); *United States v. National Assn. of Real Estate Boards*, 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950); *United States v. Socony Oil Co., supra*, 310 U.S. [150] at 224–225, n.59, 60 S.Ct. [811] at 844–846 [84 L.Ed. 1129]." *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). The unlawful purpose referred to is an intent to enter into a conspiracy to violate the antitrust laws. While it is possible that this can be the intent to commit a rule of reason violation, all the cases cited by the Supreme Court involved *per se* violations— usually price-fixing. An unlawful purpose egregious enough to remove the requirement of showing anticompetitive effect, and yet not involving a *per se* violation, is difficult for this Court to imagine. These plaintiffs have not shown a purpose to enter into a conspiracy *per se* violative of the Sherman Act. Neither have they shown any direct evidence of an intent to eliminate competition. Whatever circumstances the Supreme Court may have envisioned for allowing a § 1 violation to be established by showing unlawful purpose without anticompetitive effect—not involving a *per se* violation of § 1, and not involving direct proof of an intent to eliminate competition—are not present in this case. The Ninth Circuit's formulation of the essential elements of a rule of reason, § 1 violation is applicable here.

Defendant contends that plaintiffs have made absolutely no showing as to injury to competition, and at the hearing on the instant motions, the Court closely questioned plaintiffs' counsel on this point. The following are some of his responses to the Court's questions as to what evidence of injury to competition has been presented by Robert's.

> Yes, well, the deposition of the Iwamoto family has made it clear that in the customer lines in front of the U-drive counters, that when an Aloha Airlines plane would land, the people would flock to the Budget counters, and the rest of them were there looking around at empty spaces; and then they were trying to go over and get them out of the line. (Transcript of Hearing at 34).

> . . . . .

> Well, the fact of financial information alone, sir, the Robert's financial information and their gross revenues was [sic] going up until it hit 1972; and then it dropped. (Tr. at 34–35).

> . . . . .

> And the impact on [Robert's], it's not a very far move to say there's no reason why it should affect them anymore to [sic] affect everyone else. (Tr. at 37).

> . . . . .

> From the evidence that the Iwamotos, that their business was hurt; from the findings of the CAB who said that other people couldn't do it; from the admissions of Mr. Bickson who said he was selling below cost if he sold for $7. (Tr. at 38–39).

> . . . . .

> And I'm saying, on competition, the evidence in this case right now is that when that Aloha Airlines landed, all the people ended up in front of Budget; and there are about six or seven or eight rental U-drives in front. Now that's some evidence they're affected. (Tr. at 40).

> . . . . .

> Injury to competition is not bankruptcy; it's only loss of profits. (Tr. at 40).

■ Plaintiffs have not alleged that they went out of business because of the fly-drives. They have not alleged that anyone else went out of business because of the fly-drives. They have not alleged that because of the fly-drives consumers were forced to pay more within the car rental market. They have not alleged that because of the fly-drives Budget achieved a market position that allowed it to impose onerous terms on consumers of rented cars. They have shown no diminution in competition. As is demonstrated by the quotations from plaintiffs' counsel's argument, plaintiffs are alleging only that they and other competitors of Budget lost money. It is clear to the Court that their contention is that this is enough of a showing of injury to competition to withstand a motion for summary judgment. It is equally clear to the Court that they are wrong.

■ As has been said many times, many ways, the antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). And competition is not injured simply because one or more competitors suffer a loss of income. Lessening of competition can be shown if the number of competitors is reduced appreciably, or if there are outward signs of adverse effects on competitive conditions such as rising prices, or onerous terms being imposed on consumers, but adverse impact is simply not shown by a loss of profits, or even by the total elimination of one competitor.

As was stated by the Ninth Circuit in *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 450 (9th Cir. 1979):

> Plaintiff had to demonstrate genuine issues of material fact not only with respect to the causal connection between its

injury and defendants' actions, rather clearly appearing here, but also that its injury was of the type the antitrust laws were intended to prevent, that is, that defendants' conduct did have some anticompetitive effect beyond plaintiff's own loss of business or the market's loss of a competitor.

And again in *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); the Ninth Circuit stated:

> To amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon the plaintiff's business. . . . The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged.

Many other cases make the same point.[11]

Despite the clear case law, plaintiffs dispute this conclusion. In their Memorandum in Opposition to Defendant's Motion for Summary Judgment, they make several points. They first contend that since Budget was "already in a position of dominance in the discount car rental industry, and indeed in the car rental industry overall, at the time it developed its fly-drive programs," that alone is enough to allow a jury to conclude that there was an unreasonable restraint of trade. They cite *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). In the first place, as defendant points out, there is no evidence

before the Court that Budget was in a position of market dominance. In the second place, *Columbia Metal* is inapposite. The allegations in that case were that Kaiser, which controlled 80% of the aluminum culvert market, conspired to drive one of its few competitors out of business. 579 F.2d at 32. Here, there is no contention that Budget's market share was even close to 80%. In addition, in this case, Budget had literally scores of competitors. Finally, there is no evidence at all that the contract or conspiracy had as its purpose putting particular competitors of Budget out of business. Robert's first contention is untenable.

■ Plaintiffs' second contention is that because the "core of the fly-drive programs was the illegal reduction of air fares by Aloha," such illegality "must be weighted heavily in the jury's calculus of reasonableness." Apparently plaintiffs believe that because of the illegal methods allegedly used, injury to competition need not be further shown. Defendant's position is that under the antitrust laws, the legality or illegality of particular conduct (as measured by laws other than the antitrust laws) is totally irrelevant in determining whether there has been an unreasonable restraint of trade. Although the Court agrees with plaintiffs that the legality or illegality of a course of conduct is a *relevant* factor in a rule of reason case, a threshold question is, nevertheless, whether given that illegal conduct, there has been an injury to competition.

---

11. *See, e. g., Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) ("It is the impact upon competitive conditions in a definable product market which distinguishes the antitrust violation from the ordinary business tort"); *Golden Gate Acceptance Corp. v. General Motors Corp.*, 597 F.2d 676, 678 (9th Cir. 1979) ("No allegation or evidence as to an adverse effect upon competition was presented by appellants other than the fact that one distributor would be replaced by another"); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 90–91 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Stifel, Nicolaus & Co., Inc. v. Dain, Kalman & Quail, Inc.*, 430 F.Supp. 1234 (N.D.

Iowa 1977); *A.D.M. Corp. v. Sigma Instruments, Inc.*, 481 F.Supp. 1297 (D.Mass.1980); *Petroleum for Contractors, Inc. v. Mobil Oil Corp.*, 1978–2 Trade Cases (CCH) ¶ 62,151 at 75,082 (S.D.N.Y. July 5, 1978) ("Accordingly, if plaintiffs are to state a claim under § 1 of the Sherman Act, specific factual allegations of injury to competition will have to be pleaded"); *Prestige Manufacturing Corp. v. Martin Beverage Co.*, 1977–1 Trade Cases (CCH) ¶ 61,413 at 71,544 (S.D.N.Y. April 29, 1977) ("The complaint herein contains no allegation, nor any fact from which an allegation may be inferred, that a market, however defined, has suffered a diminishing of competition attributable to defendants' activities").

The Court does not believe that the cases defendant cites stand for the proposition that assuming injury to competition, the legality or illegality of the conduct that caused such injury is irrelevant. Conduct that is arguably reasonable despite injury to competition, because of valid business or market considerations, may well be found by a jury not to be reasonable if in violation of non-antitrust laws. A jury might even be instructed that after finding injury to competition, one factor they could consider in determining whether a restraint was reasonable, was whether the restraint or conduct surrounding it violated a particular non-antitrust law or regulation. A rule of reason determination is made by looking at all facts surrounding a restraint.

Defendant relies on *Sitkin Smelting & Refining Co., Inc. v. FMC Corp.*, 575 F.2d 440 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). That case involved an allegation of sham bidding, whereby one of the bidders was given the opportunity to match the highest bid received in the bidding process. If it matched that bid, it was to be awarded the contract. Defendant cites some unconditional language from the case: "Conduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law." 575 F.2d at 447. Yet, the case talks of conduct not otherwise within the scope of the antitrust laws, and conduct that injures competition is within that scope, even though under some circumstances it may not violate the Sherman Act. *Sitkin* emphasizes the fact that there was no evidence that market prices, quantity or quality were affected. There was no evidence of any material diminution in compe-

tition. Similarly, in this case, plaintiffs have not shown any diminution in competition or adverse effect on market price.[12] *Sitkin* supports the position of defendant, but it does not make the legality of conduct irrelevant in a rule of reason analysis.

■ Defendant also cites *Juneau Square Corp. v. First Wisconsin National Bank*, 475 F.Supp. 451 (E.D.Wis.1979). In that case, illegal and unfair means were allegedly used to drive a competitor out of business. The district judge told the jury that in order to find an antitrust violation, they would first have to find an injury to competition. He also instructed the jury that the illegal nature of acts committed by the defendants was irrelevant. In reviewing a motion for a new trial, the court stated:

> Whether any of these acts also violated principles of tort law was not, in and of itself, determinative of an antitrust violation. Merely because a defendant's acts may have constituted a tort does not automatically make that defendant's acts violative of the Sherman Act.

475 F.Supp. at 457. The court also noted that plaintiffs had, in closing argument, presented their theory regarding the allegedly illegal conduct to the jury. Looking at the judge's comments as a whole, this Court believes they do not stand for the proposition that the legality or illegality of conduct is irrelevant. It *is* irrelevant, however, in determining whether there was injury to competition, and tortious or illegal conduct does not "automatically, in and of itself," establish an injury to competition, and therein a violation of the Sherman Act.

Plaintiffs next claim that the unreasonableness of the restraints (and hence by implication the injury to competition) is *ipso facto* demonstrated because there was a

---

**12.** *Sitkin* even contains some language favorable to plaintiffs. The court talks of a showing that the contract or conspiracy in a substantial way "unreasonably restrict[ed] competitive opportunity." 575 F.2d at 448. Though plaintiffs have not pressed *Sitkin* in this regard, they could argue that since they were unable to legally meet Budget's price, their competitive opportunities were unreasonably restricted. However, the way the Court approaches the

problem, nothing unreasonably restricts competitive activity unless it affects more than the profits of competitors. If a restraint forces competitors out of the market so that competition is reduced, or if it allows someone in the market to *raise* market prices or otherwise adversely affect the consumer, then and only then can there be an unreasonable restriction of competitive opportunity.

drastic reduction in prices, "despite increasing cost pressures on all car rental companies during this period." They cite in conjunction with this *Ben Hur Coal Co. v. Wells,* 242 F.2d 481, 486, (10th Cir.), *cert. denied,* 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1427 (1957). That case involved a claim that the defendant sold goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor in violation of § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a (1976). No claim is made with regard to that section in this case, and no evidence of any specific intent to destroy a particular competitor or competition has been shown.

Budget aptly cites *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72 (3d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). That case involved a claim that Chrysler violated § 1, because it subsidized its partially-owned dealers without providing similar assistance to independent dealers. Though the effect of the subsidies was to lower prices to consumers, the plaintiff claimed that the subsidies were unreasonable because it could not compete, and its competitive opportunities were, therefore, unreasonably restricted. The court held that unless there was forward vertical integration that had the effect of concentrating Dodge sales in the hands of Chrysler-owned dealers, there was no antitrust violation. The court ruled that the subsidies had a pro-competitive effect at both intrabrand and interbrand levels. This was despite the fact that the subsidies obviously reduced the profits of non-subsidized dealers, and despite the fact that plaintiff claimed some of the cars sold by its subsidized competitors were sold at prices that no private venture capital dealers could afford to meet.

■ Similarly, in this case, plaintiffs contend that because they were unable to meet Budget's price without losing money, there was injury to competition. As the *Glauser* court rejected that contention, so does this Court. Plaintiffs attempt to distinguish *Glauser* because that case dealt only with intrabrand competition, and this one deals with interbrand competition. The *Glauser* court, however, did not so limit its holding, and in fact stated that the rule of reason standard is as applicable to restraints on intrabrand competition as it is to restraints on interbrand competition. 570 F.2d at 82.

Plaintiffs' final contention is that the Supreme Court in *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), held that there can be injury to competition when a competitor loses profits because forced to match a very low price not justified by costs. The Court noted that a jury could reasonably have concluded "that a competitor who is forced to reduce his price to a new all-time low in a market of declining prices will in time feel the financial pinch and will be a less effective competitive force." 386 U.S. at 699–700, 87 S.Ct. at 1334. This Court first notes that *Utah Pie* involved a claim under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1976). The relevant portion of that section forbids discriminatory pricing where the effect "of such discrimination may be substantially to lessen competition . . . in any line of commerce . . . ." That section is not the same as § 1 of the Sherman Act, and, in addition, there was clear evidence of discriminatory pricing and some evidence of predatory intent in *Utah Pie.* Also, as defendant points out, in *Utah Pie* the jury found for plaintiff on the § 1 conspiracy count. Finally, this Court takes note of the fact that antitrust law has changed since 1967, and to the extent that the rationale of *Utah Pie* supports plaintiffs' contentions, it clashes with the rationale of *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), which requires *antitrust* injury—injury associated with lessened competition.[13] Given today's legal climate, the Court views as apropos the comments of Mr. Justice Stewart, dissenting in *Utah Pie:*

---

**13.** *Brunswick* does have some language arguably favorable to plaintiffs:

> The short-term effect of certain anticompetitive behavior—predatory below-cost pricing,

> for example—may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actually are driven from the market and competition

That the Court has fallen into the error of reading the Robinson-Patman Act as protecting competitors, instead of competition, can be seen from its unsuccessful attempt to distinguish cases relied upon by the respondents. Those cases are said to be inapposite because they involved "no general decline in price structure," and no "lasting impact upon prices." But lower prices are the hallmark of intensified competition.

386 U.S. at 705–06, 87 S.Ct. at 1337 (footnote omitted).[14] *See also Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 796 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

The Court finds that plaintiffs have not made a prima facie showing of injury to competition, a necessary component of their § 1, rule of reason cause of action. Since, as discussed above, they have also not shown any *per se* violations of § 1, their entire § 1 claim must be dismissed. Defendant agreed that if plaintiffs' § 1 claim was to be dismissed, its counterclaim should be dismissed also. Thus defendant's counterclaim will be dismissed.

## III. SECTION 2 CLAIMS

### A. *Attempt to Monopolize*

■ Plaintiffs assert that the actions of Budget in participating in the fly-drives,

and in engaging in other alleged anticompetitive conduct, establish a prima facie case of an attempt to monopolize under § 2 of the Sherman Act, 15 U.S.C. § 2 (1976), and under the Hawaii equivalent, Haw.Rev. Stat. § 480–9 (1976). There are four essential elements of a § 2, attempt to monopolize claim: 1) specific intent to control prices or destroy competition with respect to a part of commerce; 2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; 3) a dangerous probability of success and 4) antitrust injury. *California Computer Products Inc. v. International Business Machines*, 613 F.2d 727, 736 (9th Cir. 1979); *Foremost International Tours, Inc. v. Qantas Airways Ltd.*, 478 F.Supp. 589, 594 (D.Hawaii 1979).

■ The first element, specific intent, can either be shown by direct proof, or by inference from proof of the second element, predatory or anticompetitive conduct directed to accomplishing the unlawful purpose. However, if the latter method is used, the conduct must be such that it can serve as the basis for a substantial claim of restraint of trade. *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 855–56 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978);[15] *Hallmark Industry v. Reynolds Metal Co.*, 489 F.2d 8, 12–13 (9th Cir. 1973), *cert. denied*, 417 U.S.

---

is thereby lessened. Of course, the case for relief will be strongest where competition has been diminished.
429 U.S. at 489 n.14, 97 S.Ct. at 698. There is no evidence of predatory pricing here, however, *see* part III *infra*, because the hallmark of predatory pricing is its likelihood to exclude competitors from an *entire* relevant market if continued indefinitely. In this case, the alleged below-cost pricing (excluding the rebates) affected only a portion of the relevant car rental market. Even the situation anticipated in the *Brunswick* footnote was one of a competitor facing a substantial threat of being forced out of business. There is no evidence that even had the fly-drives continued indefinitely, anyone would have been forced out of the entire relevant market.

In addition, the fly-drives were not short-lived, and so any tendency to exclude competition would likely have manifested itself. As noted, there was no evidence presented of ex-

clusion of competition, nor was there even any evidence that Robert's lost money, as opposed to profits, in the years of the fly-drives. The *Brunswick* footnote does not help plaintiffs.

**14.** The dissent also relied on Utah Pie's large market share in arguing no injury to competition. Admittedly, that aspect is not present in this case.

**15.** The Ninth Circuit has, since *Janich*, listed the essential elements of an attempt to monopolize claim in different, sometimes confusing ways. In *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir. 1980), the court noted that specific intent to control prices or destroy competition, and predatory conduct directed to the accomplishment of that unlawful purpose, are the only two indispensible elements of an attempt to monopolize claim. 610 F.2d at 669. The court also noted that despite *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th

932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *Foremost Tours, supra,* 478 F.Supp. at 594.

■■■ The third element, dangerous probability of success, can be shown by direct proof of market power, but it can also be inferred from proof of specific intent to control prices or destroy competition (element 1), accompanied by predatory pricing directed toward that end (element 2). *Janich, supra,* 570 F.2d at 853; *Hallmark, supra,* 489 F.2d at 12; *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 & n. 46 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

Thus, if the second element, predatory or anticompetitive conduct that can serve as the basis for a substantial claim of restraint of trade, is made out, in some circumstances that second element can serve as the basis for an inference of specific intent, and then in turn as the basis for an inference of dangerous probability of success. In any circumstance, plaintiffs' first task is to establish specific intent by direct proof, by showing the requisite predatory or anticompetitive conduct or possibly by showing market power sufficient to support a finding of dangerous probability of success.[16]

Plaintiffs do not contend in their memoranda that they can establish specific intent by direct proof, but rather assert that they can show it by inference. Their relevant

market is the "discount" car rental market in Hawaii, though the defendant maintains that the only market raised by the pleadings is the Hawaii car rental market in general. Defendant also contends that no evidence whatsoever regarding any discount market has been presented to the Court. The Court believes that even if it looks at the discount market as the relevant market, plaintiffs have not presented evidence sufficient to withstand summary judgment.

Plaintiffs rely on certain of defendant's conduct to support the inference of specific intent. Naturally they rely on the fly-drives, but they also claim to rely on Budget's knowing participation in a conspiracy to violate the Federal Aviation Act, Budget's practice of extracting unreasonably restrictive covenants in connection with its acquisitions and Budget's 20%–25% share of the entire car rental market, "with its share for the discount car rental market being substantially greater." The Court first notes that it has been shown only one restrictive covenant, and does not believe that this covenant is such that it supports in any measurable degree Robert's claim of specific intent. Therefore, all the Court will examine is the fly-drives, Budget's conduct in connection with them and Budget's alleged market power.

---

Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), market power is relevant in determining whether specific intent to monopolize is present. This is not inconsistent with *Janich's* holding that specific intent can be inferred if there is a § 1 violation, for market power is relevant in determining whether there is a § 1 violation. *See* note 17 *infra.* The *Blair Foods* court may also have been saying that market power is relevant in connection with direct, as opposed to inferential proof of specific intent. Finally, the *Blair Foods* court may have been saying that market power is relevant even when a § 1 violation is shown, but as no § 1 violation has been shown in this case, the Court need not consider that possibility.

*Janich* also implied that there was another way specific intent could be found.

Where a plaintiff relies only upon a defendant's conduct to establish an attempted monopolization claim and does not show market power, specific intent to monopolize should ordinarily be inferred only where the alleged conduct is of a kind clearly threatening to

competition or clearly exclusionary. Thus, where the plaintiff does not allege and prove market power (element 3), he must demonstrate conduct which is clearly threatening to competition or clearly exclusionary in order to show "predatory conduct which may form the basis of a substantial claim of restraint of trade."

570 F.2d at 854 n.4. The quoted language suggests that conduct that does *not* rise to the level of an unreasonable restraint of trade, combined with market power sufficient to support a finding of a dangerous probability of success, may also serve as the basis for an inference of specific intent. Thus, in reality, plaintiffs can demonstrate specific intent by direct proof, by showing a substantial restraint of trade (a § 1 violation) or by showing some lesser restraint of trade combined with very significant market power.

**16.** As regards the latter method, *see Janich, supra,* 570 F.2d at 854 n. 4 and note 15 *supra.*

Market power is relevant in several ways in connection with specific intent. First, market power is relevant when considering whether there is a substantial claim of restraint of trade from which to infer specific intent, because in a rule of reason case, injury to competition is determined by reference to a particular market, and by reference to the market shares held by the alleged conspirators.[17] Second, a different type of market power is relevant if a plaintiff cannot support a substantial claim of restraint of trade. He may be able to show inferable specific intent by showing market power sufficient to support a finding of dangerous probability of success, combined with conduct that does not rise to the level of a § 1 violation. *See* note 15 *supra; cf.* note 17 *supra.*[18] The Court will consider the latter type of market power first.

Plaintiffs have not made a showing of market power sufficient to support a finding of dangerous probability of success, even if the discount car rental market is considered as the relevant market. The only evidence regarding market share is an estimate that Budget's present market share in the entire Hawaii car rental market is 20%–25%. There is no evidence regarding Budget's share of the discount car market, though Robert's naturally contends that it is significantly higher. Still, whatever market power Budget holds is market power in a very competitive market. Rob-

---

**17.** In *California Computer Products, supra,* the court made the following statement: "Market power is relevant to determining whether [making an inference of specific intent from a § 1 violation] is proper, but where a § 1 violation 'clearly' exists, proof of market power is unnecessary to support an inference of specific intent." 613 F.2d at 736–37 (footnote omitted). *See also Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 453 n.47 (9th Cir. 1979). The Court is puzzled by this statement. It does not see how market power is relevant in inferring specific intent from a § 1 violation that exists, but is not relevant when that § 1 violation "clearly" exists. There cannot be a meaningful distinction between violations that "merely" as opposed to "clearly" exist.

The *California Computer Products* court may have been attempting to equate a "clear" violation with a *per se* violation. However, once a § 1 violation is found, be it *per se* or rule of reason, the same market power considerations should control in determining whether to infer specific intent. Proof of market power may not be indispensable once a § 1 violation has been established, but the role of market power cannot be both qualitatively and quantitatively different, depending on whether the violation is rule of reason or *per se.* Rule of reason violations have as a concomitant part market *definition,* while *per se* violations apparently do not. *See California Computer Products, supra,* 613 F.2d at 737 n.10. Thus, the court may simply have been trying to say that in determining whether there is a *per se* violation of § 1, market definition (and by implication market power) is not relevant, and so when considering whether to infer specific intent from a *per se* violation, market definition (and hence by implication market power) is not indispensable.

It is also possible that the court was trying to paraphrase *Hallmark Industry v. Reynolds Metal Co.,* 489 F.2d 8, 12–13 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), which stated: "Therefore, evidence of market power may be relevant, but it is not indispensable where a substantial claim of restraint of trade is made." *Hallmark,* however, made no distinctions between rule of reason and *per se* violations, or between clear and other types of violations. A substantial claim of restraint of trade is always necessary for a § 1, rule of reason violation.

There is a difference between the market power considerations that go into a determination of whether there was an unreasonable restraint of trade, and the market power considerations that go into a determination of whether there was a dangerous probability of successfully monopolizing a particular market. Even absent the latter degree of power, the market share held by the defendant may well be relevant in determining whether the conduct of the defendant was sufficient to support a finding of an unreasonable restraint of trade.

Determinations of injury to competition are made after examining all the facts surrounding a restraint. Acts carried out by a manufacturer with a 5% market share might not injure competition, while those same acts, when carried out by a manufacturer with a 33% market share, might well injure competition. Yet, that 33% market share probably could not support a finding of dangerous probability of success. The Court notes that it has already found that the fly-drives have not been shown to have injured competition regardless of Budget's market share.

**18.** As was stated in note 15 *supra,* market power may be relevant in a third way—in connection with *direct* proof of specific intent. As noted, plaintiffs, in their memoranda, have not tried to establish specific intent by direct proof, but rather only by inference.

ert's has presented no evidence regarding the number of companies competing in the car rental market in Hawaii. Defendant has presented some probative evidence [19] that the number of car rental companies in Hawaii increased during the years 1973 to 1976, and was at all times over one hundred. Budget's competitors included Hertz, Avis and National (although Robert's might claim that those companies were not strong competitors in the discount car rental market). One of Robert's owners testified at his deposition that he believed Robert's fleet size and volume were greater at that time than in 1971, the year the fly-drives first started.

The Court also notes that the practice that is the basis of the attempt to monopolize claim—the fly-drives—is a practice whereby Budget was renting cars for *one day* to certain airline customers at alleged predatory rates. Subsequent days were at regular prices. Plaintiffs have presented no evidence on the percentage of rental business that these programs accounted for, but that percentage is obviously an important factor in the Court's determination of what market share is necessary to support a finding of dangerous probability of success. All the evidence so far presented has indicated that the car rental market in Hawaii, or even the discount car rental market in Hawaii, is highly competitive, and at least as competitive now, and at the time the lawsuit was filed, as it was during the time preceding the fly-drives. The market share

necessary to support a finding of dangerous probability of success in this case is higher than has been shown to belong to any operator in the car rental (or discount car rental) business.

In *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 F.Supp. 274 (N.D.Cal.1976), the court was considering dangerous probability of success in connection with a claim that Motorola had attempted to monopolize the private two-way radio communications market in Northern California and the United States. Plaintiff presented affidavits that Motorola's share was 71%, and other evidence was that Motorola's share was 64%. The court noted that even given this market share, the relevant market was so competitive that it virtually precluded a finding of dangerous probability of success.[20]

Though the market share required for monopoly power is perhaps different from the market share required for dangerous probability of success, the Court finds instructive the views of other courts as to what market share is necessary for monopoly power. In *United States v. Aluminum Company of America*, 148 F.2d 416, 424 (2d Cir. 1945) (Learned Hand, J.) the court expressed doubt as to whether a 60%–64% market share could amount to a monopoly. In *Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 481 F.Supp. 965, 986 (N.D.Cal.1979), the court found that I.B.M.'s 53.8% market share in

**19.** Defendant has introduced copies of the yellow pages from the telephone books of the several Hawaii counties from 1973, a period at the height of the fly-drives, and from 1976, a period just prior to the filing of the instant lawsuit. Though the yellow pages themselves are hearsay, the Court believes they could either come into evidence under one of several exceptions to the hearsay rule, or else the data underlying them (which is almost certainly reliable) could be proved by non-hearsay testimony.

**20.** The court granted defendant's motion for summary judgment on the ground that there was not sufficient evidence to support a finding of either specific intent to monopolize or dangerous probability of success. The court did note that if it had been forced to decide the

dangerous probability issue, it would have required more evidence defining the relevant market.

What this Court considers most instructive about *Motorola* is that the basis for the antitrust violations was alleged unfair trade practices. The *Motorola* court noted: "While plaintiff may have a viable cause of action under state law or the Federal Trade Commission Act, this court does not believe that defendant's conduct, even accepting plaintiff's version of it, is sufficient to support the requisite inference of intent to monopolize under section 2." 421 F.Supp. at 291. In this case, though the relevant market is also very competitive, plaintiffs have not even presented evidence that Budget's market share was as large as Motorola's in the *Motorola* case.

one peripheral computer product market did not rise to the level of a monopoly share. Though these cases are only guides for the Court, they reinforce its view that plaintiffs have not presented evidence sufficient to withstand summary judgment on this issue, especially considering the fact that the relevant market is a very competitive one. Plaintiffs have not shown a market share sufficient to support a finding of dangerous probability of success.

Plaintiffs, therefore, must show predatory or anticompetitive conduct that can serve as the basis for a substantial claim of restraint of trade.[21] The Court has already determined that the conduct in this case did not rise to the level of an unreasonable restraint of trade. That forecloses the possibility that the alleged predatory and anticompetitive conduct can serve as the basis for an inference of specific intent. Plaintiffs, however, contend that there was predatory pricing. The Court notes that element 2 of the cause of action, as it is presented by *Janich*, is predatory pricing *or* anticompetitive behavior, but for this element alone to support an inference of specific intent (element 1) it *must* rise to the level of an unreasonable restraint of trade. The Court will, nevertheless, discuss plaintiffs' claim, as it appears that the Ninth Circuit definition of predatory pricing tracks the Ninth Circuit definition of conduct that constitutes an unreasonable restraint of trade.

In *Janich*, predatory pricing was defined as follows:

> Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits [citations omitted]. Therefore, the product must be such that if predatorily priced, rivals are likely to be driven out of the market or excluded, allowing the firm to raise prices.

570 F.2d at 856. Here, there is no evidence that defendant was foregoing profits, since it was receiving rebates from the airlines. In addition, as the Court noted in connection with the § 1 claims, there is no evidence that any rivals were driven out of the market or excluded. There is no evidence that anything Budget did gave it the ability to raise prices. There is no evidence that had the fly-drives continued, Budget would have been in a position to either exclude competition or raise prices. In short, there is no evidence of predatory pricing.

Even the alleged below-cost pricing (excluding rebates) occurred on only a part of Budget's total business. In *Janich*, the court indicated that the pricing of one product in an entire line at a low level is predatory only if it is likely to drive out or exclude rivals from the entire market. 570 F.2d at 856–57. Even if rivals are unable to sell the one low-priced product, there is no predatory pricing unless that inability to sell is likely to drive them out of the entire market—in this case either the Hawaii car rental market or the Hawaii discount car rental market. While Robert's has presented some evidence that other car rental firms were unable to compete effectively for the patronage of certain Aloha customers, they have presented absolutely no evidence that those firms were unable to compete within other segments of the car rental or discount car rental markets.

Even were the fly-drives such an important part of the market as to provide a vehicle for a predatory pricing claim, there is no evidence that Budget was selling below marginal, or average variable cost. That is the case even if the rebates are totally ignored. In *Janich*, the court indicated that once a product has enough market importance to sustain a predatory pricing claim, predatory pricing can be shown by demonstrating sales below marginal cost, or where that is too difficult to show, sales below average variable cost. 570 F.2d at 857; *Hanson v. Shell Oil Co.*, 541 F.2d 1352,

---

**21.** It is perhaps possible that an inference of specific intent may be drawn exclusively from conduct that is not actionable under § 1, but only if that conduct is unilateral, and hence not a contract, combination or conspiracy. The conduct must still unreasonably restrain trade, and hence a plaintiff would still have to show an injury to competition.

1358 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Marginal cost has been defined as "the increment to total cost that results from producing an additional increment of output." Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 700 (1975). Marginal cost is sometimes difficult to ascertain from conventional business records, and average variable cost [22] is likely to approximate marginal cost. *Areeda & Turner, supra*, 88 Harv.L.Rev. at 700 n.13, 716–17 & n.42; *Janich, supra*, 570 F.2d at 858.

In this case, though there has been some deposition testimony that the $7 fly-drives were below "cost," the context in which the statements were made indicates that the cost referred to was average cost, not marginal or average variable cost.[23] It must be remembered that the $7 rate was only for the first day of the fly-drives. Therefore, it would be necessary to determine the average length of the car rental portion of the fly-drivers, and the average revenue to Budget from each fly-drive. Then the marginal or average variable cost of the average fly-drive would have to be determined. There has been no evidence that this cost was less than what Budget took in, even ignoring the rebates.

Marginal or average variable cost parameters are suggested by this excerpt from plaintiffs' counsel's argument on the § 2 claims:

Now, that's a fair inference from that, that when other people are forced to sell for $7, as is our testimony replete to the depositions, that when the cars were stacked up in the parking lot—and it's a perishable commodity; if you don't rent today, you'll never rent it again. It's like a hotel room. You rent for whatever you can get if for. (Tr. at 41).

If renting cars for the $7 rate was below *marginal* cost, it would have been unprofitable for anyone to have rented them. Businessmen do not rent for whatever they can get, if what they can get is less than marginal cost. As discussed in note 23 *supra*, however, this analysis may not be valid if the fly-drive cars Budget was renting would have been rented anyway.

Because Robert's has failed to make a sufficient showing as to specific intent, its attempt to monopolize claim cannot withstand summary judgment. In making this specific intent determination, the Court has also determined that plaintiffs have not presented evidence sufficient to withstand summary judgment as to whether there was 1) predatory or anticompetitive conduct that can serve as the basis for a substantial claim of restraint of trade; 2) market power sufficient to support an inference of dangerous probability of success or 3) predatory pricing that was likely to drive out or exclude rivals from the entire relevant market.[24]

**22.** Fixed costs are those that in the short run do not vary with changes in output. They include such things as expenses of management, interest on bonded debt and items of irreducible overhead. Variable costs vary in the short run with changes in output. They include *such items as raw materials, fuel, labor* used to produce the product, indirect labor for clerical and custodial tasks, utilities, repair and maintenance costs and per unit royalties and license fees. Average cost is determined by adding the fixed and variable costs and dividing by output. Average variable cost is determined by dividing the variable costs by output. *Areeda & Turner, supra*, 88 Harv.L.Rev. at 700; *Janich, supra*, 570 F.2d at 858 & n.11; *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980).

**23.** There was testimony that Budget admitted *that absent the payments from Aloha it would* have lost money on the fly-drives. This probably means it would have lost money considering average cost. Average cost is the relevant cost if before the fly-drivers all of the Budget's cars were being rented. If a firm is operating at capacity, marginal cost must include increasing the ability to produce, and in this context that would mean either buying more cars or reducing turnaround time. If there is complete use, reducing prices only results in losing money (disregarding the rebates). There is no evidence regarding what percentage of Budget's, or anyone else's cars were being rented prior to the fly-drives.

**24.** The Court has also discussed whether there was below marginal cost pricing of any product, aside from the question of whether that

## B. *Conspiracy to Monopolize*

Plaintiffs have also made a claim that the defendant engaged in a conspiracy or combination to monopolize in violation of § 2 of the Sherman Act, and in violation of Haw.Rev.Stat. § 480–9 (1976). Though plaintiffs and defendant disagree as to the elements of a prima facie case of conspiracy to monopolize, one element of that cause of action is specific intent to monopolize, *i. e.*, specific intent to control prices or destroy competition in any line of trade or commerce. *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1205 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Chisolm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1144 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651 (E.D.Pa.1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977). *See also Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 453 & n.48 (9th Cir. 1979).

The test for specific intent is no different when a conspiracy to monopolize claim, as distinguished from an attempt to monopolize claim, is being considered. Since the Court has already held that plaintiffs have satisfied none of the possible tests for specific intent in connection with their attempt to monopolize claim, their conspiracy to monopolize claim must also fall.

## IV. SECTION 7 CLAIMS

Plaintiffs also seek relief for alleged violations of § 7 of the Clayton Act, 15 U.S.C. § 18 (1976), and the Hawaii equivalent, Haw.Rev.Stat. § 480–7 (1976). They challenge certain acquisitions made by the defendant, and also challenge certain alleged anticompetitive conduct made possible by the acquisitions. They seek divestiture, damages and other injunctive relief.

Plaintiffs challenge the 1969 acquisitions of Budget Rent-A-Car of Hawaii, Budget Rent-A-Car of Kauai and Budget Rent-A-Car of Maui, by Leisure Corporation, Budget's predecessor in interest. Plaintiffs are also apparently trying to challenge Budget's subsequent acquisitions of its sublicensee on Maui and a non-licensee, Island Holidays. These two acquisitions were not mentioned in the complaint, and the Court does not consider that defendant was fairly apprised that they would be part of the § 7 claim. If plaintiffs make a motion to amend the Court will consider it, though it is unlikely the present trial date can be kept if claims based on these two acquisitions are added.

Defendant first contends that Budget Rent-A-Car of Hawaii was a partnership, and hence not within the reach of either § 7 or § 480–7, which forbid the acquisition of "the whole or any part of the assets of another corporation." *See United States v. American Building Maintenance Industries*, 422 U.S. 271, 279, 95 S.Ct. 2150, 2155, 45 L.Ed.2d 177 (1975). Plaintiffs concede this, but enigmatically state that this acquisition must be judged by § 1 standards. The Court notes that no § 1 claims surrounding any acquisitions have properly been raised, and the Court has not considered and will not consider any.

As to plaintiffs' request for divestiture, the Ninth Circuit has definitely ruled, as the plaintiffs admit, that divestiture is not available in a private § 7 action. *Calnetics Corp. v. Volkswagen of America Inc.*, 532 F.2d 674, 692 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *International Telephone & Telegraph Co. v. General Telephone & Electronics Corp.*, 518 F.2d 913 (9th Cir. 1975). Therefore, this Court will not consider divestiture as an available remedy.

As to any claim for damages based on the acquisitions themselves, the Court

product had sufficient market importance to even support a claim of predatory pricing, and aside from the question of whether the rebates should be disregarded. Were the only issue before the Court whether, ignoring the rebates, the fly-drives were sold at below marginal or average variable cost, the Court would find that there are disputed questions of fact on this issue.

considers them time-barred. The acquisitions occurred in 1969, and this suit was not filed until some seven years later. As was stated in *International Telephone & Telegraph Co. v. General Telephone & Electronic Corp., supra*:

> The four-year limitation of Clayton Act § 4B [15 U.S.C. § 15(b)] for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects of a possible antitrust violation and to calculate its potential effects. The abuses which would occur if plaintiffs were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old, seem apparent.

518 F.2d at 929.

■ Plaintiffs have argued that they were damaged by anticompetitive acts made possible by the merger. They cite *Purex v. Proctor & Gamble Co.*, 596 F.2d 881 (9th Cir. 1979), and contend that for these anticompetitive acts, the limitations period should be measured from the time the acts were committed. The Court believes that under the teachings of *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957) and *Purex*, a § 7 violation can be based on conduct occurring after an acquisition. When a cause of action is based on such conduct, the statute of limitations begins to run from the date of that conduct, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). That does not mean that any damage based on the merger itself reaccrues. For that damage, the four year limitations period begins to run from the date of the acquisition.[25]

■ To base a § 7 violation on subsequent conduct, however, several things must be shown. First, it must be demonstrated that the conduct was made possible by the acquisition, *Brunswick Corp. v. Pueblo Bowl-A-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977);

*Purex, supra*, 596 F.2d at 887. Plaintiffs must show either that the acts *were* anticompetitive because of the acquisitions, or that their anticompetitive nature was enhanced by the acquisitions. Acts that might be characterized as merely competitive before a merger, might well be viewed as anticompetitive when performed by a company that, because of the merger, "dominates" the market. *Purex, supra*, 596 F.2d at 885 & 887. There must be a showing that the conduct was related to an enhanced capacity to meet the short-term threat of a new entrant into a dominated market, *F. T. C. v. Proctor & Gamble Co.*, 386 U.S. 568, 579, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1967), or simply that the conduct had a tendency to substantially lessen competition or create a monopoly.

■ There has been no evidence of any conduct that had a tendency to create a monopoly in any market, or that had a tendency to stop a particular new entrant from entering a "dominated" market. Thus, plaintiffs are reduced to showing that there was conduct that had a tendency to substantially lessen competition. If they are relying on the fly-drives, they must first show that the acquisitions allowed the fly-drives to take place, or substantially enhanced their anticompetitive nature. As defendant points out, the fly-drives were offered by a non-acquired licensee as well as the acquired licensees. If regardless of the acquisitions, the fly-drives would still have been offered by all the outlets that did offer them, the anticompetitive conduct did not occur (nor was it enhanced) *because* of the acquisitions.

The Court's primary problem with this cause of action, however, is that plaintiffs must show that the enlarged corporation had some type of market dominance. In the *Purex* case, for example, the acquired firm, Clorox, led the national liquid bleach market with 48.8% of industry sales, and in certain regional markets its position approached monopoly proportions. The *Purex*

---

**25.** Though the state limitations provision, Haw. Rev.Stat. § 480–24 (1976), differs from the federal, *see* part V *infra*, this case is not one of a "continuing violation," as the fly-drives took place two years after the acquisitions. Hence, there can be no possible relation back.

court stated that the Supreme Court test as to whether the merger and subsequent conduct were illegal was whether "the acquisition had the effect of substantially lessening competition in the liquid bleach markets by raising entry barriers or by dissuading the smaller firms, such as Purex, from aggressively competing for fear of retaliation by Proctor." 596 F.2d at 887. Here, there is no evidence that Budget was a dominant firm, that it became a dominant firm in any market by reason of its acquisitions or that the acquisitions or subsequent conduct raised entry barriers. Perhaps an inference can be made that smaller firms were unable to compete for certain of Aloha's passengers, but that provides no evidence as to lessening of competition in the entire relevant market. There is no evidence that smaller firms feared Budget or feared retaliation from Budget, regardless of the financial reserves of Budget's parent, Transamerica.

 There is, in short, no evidence that any acts substantially lessened competition. While it is true a § 7 violation can occur without proof that an acquisition actually had anticompetitive effects, for damages based on *subsequent* conduct to be recoverable, there must be actual antitrust injury. In *Purex*, after the court had already described Clorox as a dominant firm, it noted that it was able to infer that the acquisition had affected competition. Here, the Court has been presented no evidence that acts allegedly made possibly by the acquisition affected competition in any market. A comment exactly on point is made in *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1024 (S.D.N.Y. 1979):

> Where an acquisition is challenged, the test is whether [the effect of] the merger "*may be* substantially to lessen competition, or *to tend to* create a monopoly." . . . Damages are still speculative and the only relief that may be had is an injunction against prospective harm. In contrast, where actions taken after the merger are challenged, actual damages must be shown; it is no longer sufficient

to show merely the potential for harm. Thus, the practical effect of the court's ruling in *ITT* is to prevent private plaintiffs suing over four years after an acquisition has taken place from availing themselves of the prophylactic rule prohibiting mergers with probable anticompetitive effects and to require them to show actual or imminent injury to competition resulting from acts committed or threatened after the combination.

In this case, plaintiffs have show no evidence of any actual or imminent injury to competition in any relevant market.

 Plaintiffs also seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26 (1979), and under Haw.Rev.Stat. § 480–13 (1976), for violations of § 7 and § 480–7. While one may sue for injunctive relief based on past, present or impending violations of the antitrust laws, *International Telephone & Telegraph, supra*, 518 F.2d at 928–29, here there is no evidence of either past or present violations of the law. Even had the acquisitions themselves initially violated the law, plaintiffs are not now entitled to injunctive relief unless they can show past anticompetitive behavior, or good reason to expect impending anticompetitive behavior. They have not met their evidentiary burden in either regard, as they have not shown any evidence of injury to competition. They are not entitled to injunctive relief.

## V. SECTION 480–2 CLAIMS

Plaintiffs have made a claim based on Haw.Rev.Stat. § 480–2 (1976), which states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Section 480–3 states: "It is the intent of the legislature that in construing section 480–2 the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act." Section 480–13 allows treble damage recovery for violations of § 480–2, provided either that the defendant is a merchant as defined by the Hawaii Uniform Commercial

Code, Haw.Rev.Stat. § 490 *et seq.* (1976), or that the proceeding or suit is in the public interest as those "terms are interpreted under section 5(b) of the Federal Trade Commission Act," 15 U.S.C. § 45(b) (1976).

■ Defendant's first claim is that because only the Federal Trade Commission can enforce the Federal Trade Commission Act, § 480–2 does not create any private right of action. Whatever small doubts previously existed on that score were resolved by the decision of the Hawaii Supreme Court in *Ai v. Frank Huff Agency, Ltd.,* —— Haw. ——, 607 P.2d 1304 (1980). Section 480–13 creates a private right of action for violations of § 480–2.

■ Defendant's next argument is that because the antitrust claims do not state causes of action, neither can the § 480–2 claim. Many cases that hold that an integral part of a § 1 claim is injury to competition, also state that one reason for this is that the antitrust laws are no substitute for state unfair trade practice or business tort laws.[26] The antitrust laws are primarily, if not exclusively, for the protection of competition, but unfair trade practice laws are for the protection of competitors as well. The standards for establishing causes of action are different, and plaintiffs' inability to make out a viable antitrust claim does not doom their § 480–2 claim to failure.

Defendant next contends that even if the standards for an antitrust violation and for a § 480–2 violation are different, it has done nothing that could be considered an unfair trade practice. In order to examine this contention, the Court must determine the meaning of § 480–2.

In *Ai,* the Hawaii Supreme Court noted: "HRS § 480–2, as its federal counterpart in the FTC Act, was constructed in broad language in order to constitute a flexible tool

to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen." In addition, as noted in *Ai,* the Hawaii House Judiciary Committee, in recommending passage of § 480–2, quoted Congressional justifications for the broad, sweeping language of the Federal Trade Commission Act:

It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task.

S.C.Rep.No. 267, 3d Leg., Reg.Sess., House Journal at 600 (1965) (quoting H.R.Conf. Rep.No. 1142, 63d Cong., 2d Sess., at 19 (1914)). It is clear then, that the language proscribing unfair and deceptive practices in § 480–2 is far-reaching.

■ In *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), the Supreme Court was considering the sweep of § 5 of the F.T.C. Act, 15 U.S.C. § 45 (1976):

Thus, legislative and judicial authorities alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.

405 U.S. at 244, 92 S.Ct. at 905. The Court approvingly cited the criteria used by the Commission in determining whether a particular practice offends public values and is, therefore, unfair.

---

26. *See, e. g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *General Communications Engineering, Inc. v. Motorolo Communications & Electronics,* 421 F.Supp. 274, 290–91 & 294 (N.D.Cal.1976); *Arizona v. Cook Paint & Varnish Co.,* 391 F.Supp. 962 (D.Ariz. 1975), *aff'd,* 541 F.2d 226 (9th Cir. 1976), *cert.* denied, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977); *Associated Radio Service Co. v. Page Airways, Inc.,* 414 F.Supp. 1088 (N.D.Tex. 1976); *Eye Encounter, Inc. v. Contour Art, Ltd.,* 81 F.R.D. 683 (E.D.N.Y.1979); *Petroleum for Contractors, Inc. v. Mobil Oil Corp.,* 1978–2 Trade Cases (CCH) ¶ 62,151 at 75,082 (S.D.N.Y. July 5, 1978).

"(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some commonlaw, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8355 (1964).

405 U.S. at 244–45 n.5, 92 S.Ct. at 905.[27] As was additionally stated in *Spiegel, Inc. v. F.T.C.*, 540 F.2d 287, 293 (7th Cir. 1976):

In determining whether Spiegel's challenged practices are unfair under Section 5 of the Act, the Commission remained faithful to its previously announced criteria. A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

The Court must use this type of test to measure the evidence produced by plaintiffs. They have alleged that defendant knowingly conspired with certain airlines to violate the Federal Aviation Act. They have alleged that defendant engaged in certain promotions that were in violation of the Act. They have alleged that they and other competitors could not engage in the same types of programs because of their illegal nature. It is true that the defendant could not have been sanctioned by the C.A.B. for participating in a program that violated the Act, but that is not determinative of the § 480–2 claim. To the contrary, participating in such a program, knowing it to be in violation of the Act, could be considered as offensive to public policy, and immoral, unethical, oppressive or unscrupulous. There is at least a question of fact on this point.[28]

Defendant also argues that plaintiffs are barred by the statute of limitations. First of all, the Court notes that for any of the fly-drives that took place after December 16, 1972, the statute of limitations is no bar. Regardless of whether plaintiffs knew of their cause of action as to some fly-drives before this date, each new fly-drive was an alleged new act of unfair competition or a new unfair trade practice, and hence as each fly-drive occurred, a new cause of action accrued. Haw.Rev.Stat. § 480–24 reads:

27. The Court viewed these criteria not as relevant only in the context of cigarette advertising, but rather as those generally used by the Commission in considering questions of fairness.

28. Some guidance is available from other courts as to what constitutes an unfair method of competition or an unfair trade practice. In *Barquis v. Merchants Collection Association of Oakland, Inc.,* 7 Cal.3d 94, 496 P.2d 817, 101 Cal.Rptr. 745 (1972), the court was discussing California's statute prohibiting unfair competition, which is statutorily defined as any unlawful, unfair or fraudulent business practice. The court talked of such things as wrongful business practices generally, in whatever context they may occur. The court also spoke of violations of fundamental rules of honesty and fair dealing.

In *Covenant Radio Corp. v. Ten Eighty Corp.,* 35 Conn.Supp. 1, 390 A.2d 949, 955 (1977), the court, quoting *Spiegel,* defined an unfair trade practice as one that offends "public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Interpretations of the Connecticut statute, as interpretations of § 480–2, are to be guided by interpretations of § 5 of the F.T.C. Act.

In *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 341 A.2d 348, 352 (Super.Ct.App.Div.1979), the court noted that the tendency of the law has been to espouse scrupulous standards of commercial morality and business fairness in trade. "Reflecting this bent, it has been observed that the essence of unfair competition is fair play."

In *Harrington Manufacturing Co., Inc. v. Powell Manufacturing Co., Inc.,* 38 N.C.App. 393, 248 S.E.2d 739, 744 (Ct.App.1978), the court stated that unfair competition refers to conduct a court of equity would consider unfair. "Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others."

> Any action to enforce a cause of action arising under this chapter shall be barred unless commenced within four years after the cause of action accrues . . . . . For the purpose of this section, a cause of action for a continuing violation is deemed to accrue at any time during the period of the violation.

Since the fly-drives are alleged to have been a continuing violation, the Court believes that at least insofar as the post December 16, 1972 fly-drives are concerned, the statute of limitations is no bar.

Defendant has cited some cases that seem to indicate that in an antitrust context, when a cause of action is based on an illegal contract, the limitations period begins to run from the date of that contract. That limitations period, claims the defendant, applies to all damage suffered, regardless of when it took place.

Defendant cites *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir. 1979), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1980), in support of its position. In that case, the court held that plaintiff's damage was certain and the limitations period began to run from the time of a refusal to deal. The court held that subsequent affirmance of the refusal to deal was not a new overt act, and hence did not start the statute of limitations running anew. The court quoted from *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 126–27 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976):

> Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.

591 F.2d at 72. The case at bar is clearly distinguishable both from the facts of *In Re Multidistrict Vehicle Air Pollution*, and from the situation spoken of in *Poster Exchange*. Here, the violation was not final

at the time the contracts were signed—it was continuing, and it continued each time there was a fly-drive. A refusal to deal, accompanied by indications that that refusal is permanent, is arguably by its very nature "permanent at initiation without further acts." An open-ended contract, with no set output, is a far different story. Defendant also cites *El Paso v. Darbyshire Steel Co., Inc.*, 575 F.2d 521 (5th Cir. 1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). The *El Paso* court held that even though the defendant received payments under a contract until 1974, the statute of limitations started running when the contract was signed in 1970. While on its face that is the situation here, the *El Paso* court noted that on the date the contract was signed, the rights and liabilities of the parties were finalized. "On that date, the price, the quantity, and the delivery schedule were fixed by the terms of the contract. Any damages caused by the alleged conspiracy were provable with certainty on that date." 575 F.2d at 523. Here, the quantity and delivery schedule were by their very nature unascertainable when the contract was signed.

The Court also believes that at the time the contract was signed, damages were too speculative to be proven. As was stated by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971): "[E]ven if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." At the time the original contracts were signed, plaintiffs could not have proved their damages, because it was totally uncertain how many, if any, fly-drives would take place. The program could have lasted for a month, or it could have lasted for years. The Court has examined the cases cited by the defendant, and believes they are all distinguishable from the case at bar. The nature of the damages in those cases was much less speculative at the time the limitations period began, than it was in this case when the fly-drive agreements were entered into.

The Court also doubts whether the general rule cited by the defendant is even valid. [I]t is not at all clear that a cause of action pertaining to a contract which is alleged to be in unreasonable restraint of trade accrues upon execution of the contract. Controlling Ninth Circuit authority indicates that each partial performance of a contract alleged to be in restraint of trade causes the satute [sic] to run anew. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir. 1975). To hold otherwise is to say that some damage that might have been sustained was barred before it accrued. *Twin City Sportservice, supra*, at 1270.

*General Atomic Co. v. Exxon Nuclear Co., Inc.*, 1979–2 Trade Cases (CCH) ¶ 62,966 at 79,499 (S.D.Cal. September 6, 1979). Because the Court views the fly-drives as an alleged continuing violation of § 480–2, *see* Haw.Rev.Stat. § 480–24, and also because the Court views the federal rule cited by the defendant as not applicable to these facts, the cause of action based on fly-drives that took place after December 16, 1972 is not barred by the statute of limitations.

As for fly-drives prior to that date, the Court believes § 480–24 may still control. If read literally, the statute allows the limitations period for all acts to begin running from the date of the last act, if the violation is a continuing one. Since the alleged acts of unfair competition are the fly-drives themselves, as well as the fly-drive agreements, the alleged violation here continued past December 16, 1972. Nevertheless, the Court does not foreclose further argument on this point.

■ Plaintiffs also argue that there was fraudulent concealment. To the extent that their cause of action is based on below-cost pricing, they have no argument. They always knew the lower price that Budget was charging renters, and they had to have had a very good idea of what Budget's costs were. To the extent that their cause of action is based on Budget's entering into contracts that were in violation of the Federal Aviation Act, they have raised material questions of fact as to fraudulent concealment. They contend that Budget hid the true nature of the rebates it received, and hence they were prevented from learning that the Federal Aviation Act was being violated. Plaintiffs have presented sufficient evidence to withstand a motion for summary judgment on this issue. To the extent that plaintiffs can show a continuing violation of § 480–2, or fraudulent concealment of a § 480–2 violation, they can recover provable damages caused by fly-drives that took place prior to December 16, 1972.

■ Plaintiffs have requested that this Court instruct the jury that the fly-drive contracts were illegal under the Federal Aviation Act. They contend that there are no material questions of fact as the illegality of the contracts, and also that Budget is collaterally estopped from denying the illegality of the contracts. As the Court has already held, the legality of the contracts is relevant in this case. Obviously, most evidence surrounding the contracts will be introduced at trial, as both the nature of the contracts and their competitive fairness or unfairness is relevant. Were the Court to now rule that the contracts were illegal, no trial time would be saved, as the Court is certainly not going to rule that if the contracts violated the Act, the defendant automatically violated § 480–2. The purpose of summary judgment is to eliminate unnecessary issues from trial, and thus cut down on trial time. Since granting summary judgment on this point would not have this effect, summary judgment is denied.

■ Plaintiffs also request that Budget be bound by certain facts established in two prior C.A.B. proceedings and in litigation in this Court. The Court first notes that Budget was not a party in any of those proceedings. Robert's cites cases for the proposition that non-parties can in some circumstances be bound by prior proceedings, but the prior proceedings in this case were not only primarily administrative, but were also conducted by an agency that had no jurisdiction over Budget. Though Robert's points out that Budget could have

intervened in the C.A.B. actions, it would be inequitable for this Court to tell Budget that it cannot protect its rights here, because it did not intervene in a proceeding before an agency that had no jurisdiction over it. While Budget might have benefited from a C.A.B. determination that the fly-drives were legal, its stake in this action is much greater than any possible stake it had in the C.A.B. actions. All the cases Robert's cites on the issue of privity involve a similarity of issues and interests between the prior and subsequent proceedings. Those cases also involve a significant amount of participation in the first action by the party sought to be estopped in the second. The Court notes that Robert's evidence as to the extent of Budget's participation in the C.A.B. proceedings is slight.

In their reply memorandum, plaintiffs rely heavily on *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 459 F.Supp. 507 (S.D.Fla.1978). In that case, the State of Florida was estopped from litigating the ownership of certain sunken treasure because of prior *in rem* litigation involving the ownership of the treasure. In the prior litigation, decided against the United States, the State had participated, had had the opportunity to intervene and would have received significant financial benefits had the United States won. The court found that the State had made a purposeful choice to cooperate with the United States, hoping to take advantage of a favorable judgment, rather than intervening and settling all possible questions that could have arisen from the operative set of facts. This case is totally different. There is no evidence that Budget directly participated in the C.A.B. actions, and there is no evidence that its interests were the same in those actions as they are here. All questions arising from the facts considered in the administrative proceedings could not possibly have been settled in those proceedings. *Treasure Salvors* is not in point, and plaintiffs are not entitled to collaterally use the C.A.B. findings.

As for the prior litigation in this Court involving Hawaiian Airlines and Aloha Airlines, the Court sees no applicable principle of law under which Budget can even conceivably be precluded from relitigating anything determined in that action. Budget is not collaterally estopped.

## VI. EVIDENTIARY MATTERS

Both parties have made a variety of motions regarding the use of certain evidence, much of it concerning Aloha's attempt to hide from the C.A.B. the true nature of the fly-drive rebates. The Court notes that the dismissal of the antitrust claims substantially changes the nature of the case, and hence the status of all evidentiary motions. Thus, all motions are denied. New motions may be made, but it is likely most matters will be determined at or near the time of the trial.

The Court feels it would be helpful to the parties to discuss generally the types of evidence that will be relevant in this case. Any factual evidence that shows the legal or illegal nature of the contracts; any evidence that shows the nature of the competitive process or the ability of Budget's competitors to compete with the fly-drives; any evidence that shows Budget's knowledge of the alleged illegal nature of the fly-drives; and any evidence that shows industry knowledge in general as to the legality or illegality of the fly-drives, will be relevant. Relevant does not mean admissible, however, and normal hearsay rules will be applied. If plaintiffs intend to introduce acts of Aloha on the ground that they are the acts of a co-conspirator of Robert's, they must show independent evidence of the conspiracy. The Court will require that a preliminary showing of a conspiracy be made outside the presence of the jury, and if the Court is not satisfied with the showing, the Court will not allow the evidence to be introduced.

The Court believes that the unfair competition claim is and always has been the heart of this lawsuit. The antitrust claims simply turn a moderately-priced case into a case that could be very expensive. The antitrust claims did not even add the element of treble damages, as treble damages are recoverable for violations of § 480–2.

For the reasons stated above, defendant's motions for summary judgment as to all the antitrust claims will be granted, and all the antitrust claims will be dismissed. Defendant's counterclaim will also be dismissed. Defendant's motion for summary judgment as to the § 480–2 claim will be denied. All of plaintiffs' motions for summary judgment or for jury instructions will be denied. The evidentiary motions will be denied with leave to renew at the appropriate times. The parties are requested to submit appropriate orders consistent with this opinion.